# EXHIBIT 12

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
                  CHARLESTON DIVISION

                         - - -

PARKER MEYER,                     :
                                  :
     Plaintiff,                   :
                                  :   CASE NO.
     vs.                          :
                                  :   2:19-cv-00640-DCN
JEFFREY ANDERSON and JEFF         :
ANDERSON & ASSOCIATES, P.A.,      :
                                  :
     Defendants.                  :
```
_____

        VIDEOTAPED VIDEO TELECONFERENCE DEPOSITION OF
                       GREGG MEYERS
_____

| | |
|---|---|
| DATE TAKEN: | Thursday, February 3, 2022 |
| TIME BEGAN: | 10:01 a.m. |
| TIME ENDED: | 1:40 p.m. |
| LOCATION: | Remote Appearance by All Parties |
| REPORTED BY: | Marie H. Bruegger, RPR, CRR<br>EveryWord, Inc.<br>P.O. Box 1459<br>Columbia, South Carolina  29202<br>803-212-0012 |

1  do that.  Mr. Anderson owed her a duty, and he was
2  trampling on it pretty severely, and it very much
3  restricted what our options were at a trial.
4       Q    But as we talked this morning,
5  Mr. Meyers, we don't know how a jury would have
6  reacted or considered any evidence of a
7  relationship between you and Parker Meyer, do we?
8  We don't know.
9       A    Well, Sam, my experience tells me that
10 this would not be a very good thing for her in
11 front of a jury.  It's one thing when the defense
12 tries it --
13      Q    Sorry I interrupted you.
14      A    Let me finish.  Let me finish.  It's one
15 thing if the defense tries it, it's another thing
16 if the friendly fire comes from your own side, and
17 that was a very different kind of problem that Jeff
18 created, entirely on his own.
19      Q    Did you ever provide a written valuation
20 of these two cases to Parker Meyer?
21      A    I don't think so.  I don't typically do
22 that, and I don't recall doing it with her.
23      Q    And please explain why you did not
24 provide a written valuation to Parker Meyer about
25 these two cases.

1    A    I don't ever do that, Sam.  I'm not a
2  defense lawyer.  I don't have to provide periodic
3  summaries to clients.  We talk.  And I don't have a
4  routine practice, I can't even think of a case
5  where I've engaged in the practice, because those
6  conversations occur only in the context of getting
7  an offer.  They don't happen periodically.  They
8  don't happen at the front end, you know, this case
9  might be resolved within X and Y, the kind of thing
10 that defense lawyers write to their carriers.  This
11 is not the kind of thing that I do.
12      Q    As counsel for Parker Meyer, do you
13 believe you had a duty to provide Parker Meyer with
14 a written valuation of her cases?
15      A    Not as an independent act.  I had a duty
16 to give her advice and counsel on any offers we
17 receive and about any demand to make.
18      Q    Did you provide Parker Meyer with a
19 verbal valuation of these cases?
20      A    Well, we certainly talked about the
21 cases, and we made a few demands that you have, and
22 so you see those are the product of conversations
23 between me and Parker.
24      Q    What was your verbal valuation of the
25 case against the North Charleston Police

1  Department?

2  A   I don't use numbers, Sam.  I say that it
3  was a dangerous case.  When Jeff told me he thought
4  it was a $10 million case, I said to him, look, I
5  mean, I've gotten $10 million verdicts before
6  twice.  I don't mean a $10 million verdict, I mean
7  a verdict in excess of $10 million twice.  But I
8  don't know that -- you can't count on that.

9         So, you know, this is -- he and I both
10 deal in intangible injuries, so he was bullish on
11 the case when he thought he had a stake in it.  He
12 lost his bullishness when he thought he didn't.  He
13 regained his bullishness when he thought he did.

14 Q   Well, I'm not asking you about Jeff
15 Anderson, I'm asking you about Gregg Meyers.
16 Excluding the issues with Jeff Anderson you've
17 described, what was your valuation to your client
18 of the case against the North Charleston Police
19 Department?

20 A   I don't have numbers that I use with my
21 clients, Sam.  I could say to her very legitimately
22 that I have gotten verdicts far in excess of a
23 million dollars in cases like this.  I don't mean a
24 warrantless entry case, I mean cases where there's
25 an intangible component, and I need a jury to value

```
 1        A    I am.
 2        Q    It says:  About a year and a half.  Do
 3   you see that?
 4        A    I see that, I do.
 5        Q    And so I understand what that means is
 6   that you had had a room in Parker Meyer's house for
 7   about a year and a half as of the July 18th, 2018,
 8   deposition.  Is that right?
 9        A    Yeah, with the clarification that it was
10   Rhonda's house, her mother's house, it was where
11   she lived, so we would informally refer to that as
12   her house.
13        Q    Well, were you and Parker Meyer living in
14   the same house for a year and a half?
15        A    No.  When I came into town, instead of
16   getting a hotel and charging it to Rhonda, her
17   mother, the agreement I had with Mark and Sam,
18   with, of course, Parker's permission, was that I
19   could take a room in their house, so instead of
20   getting a hotel and that expense.  So this was good
21   for me, it was good for the client, and it was okay
22   with Parker, and it was okay with my wife.
23        Q    Well, let me ask it this way, Mr. Meyers:
24   For a year and a half, when you were in Charleston,
25   did you stay in a room in the same house that
```

```
 1  Parker Meyer lived in?
 2       A    Most of the time.  Sometimes I stayed
 3  with other past clients who also agreed to put me
 4  up.  I didn't want to rent an apartment, Sam,
 5  because that would be expensive at a time when I
 6  didn't have a stable income.
 7       Q    You agree with me this is an unusual
 8  arrangement for a lawyer whenever he or she is in
 9  town, renting a room in his or her client's house?
10       A    Well, I mean, it may be unusual for many
11  people, but it was a weird circumstance, and I've
12  stayed with other clients who offered to put me up,
13  so it was not that unusual.  But I formalized it
14  with Mark and Sam because they were the ones who
15  made decisions for Rhonda.
16       Q    All right.  Switching gears, did you have
17  a Gmail account while you worked for Jeff
18  Anderson & Associates?
19       A    Yes, the same account I had before I
20  worked there and the same account I have now.
21       Q    I haven't seen any emails from your Gmail
22  account in this case.  Have you produced them?
23       A    We produced a log of my communications
24  with Parker in this case, which would have included
25  the Gmails.
```

1  between Parker and me.  "Fishy" is the wrong word,
2  but that was basically what Sandy kept arguing.
3       Q    Okay.  And were those cross-examination
4  questions that Ms. Senn asked in front of a jury?
5       A    I characterized it as argument, so part
6  of it was in her opening statement and part of it
7  was in bench conferences with Judge Jefferson.
8       Q    But was there any testimony about that
9  issue?
10      A    And what you've shown me this morning is
11 consistent with those points.  I don't know that
12 there wasn't other things offhand without making a
13 review of it.
14      Q    Did you make any objections to the
15 questions regarding the cell phone records coming
16 in?
17      A    We --
18      Q    I didn't see it if you did.
19      A    No.  As I indicated, we argued that issue
20 as a motion for protective order prior to trial,
21 and at trial, we were pretty sure the records would
22 come in, so we didn't oppose it.
23      Q    Well, isn't it true if you want to
24 preserve that issue for appellate purposes, you'd
25 have to make an objection?

1    A    Yeah. I wasn't worried about the issue
2  in the hands of the defense counsel. I was
3  issued -- I was worried about the issue in the
4  hands of Mr. Anderson and Carla and what would be
5  attributed to them once they got involved in
6  helping the defense, so to speak, I mean.
7    Q    There was no objection made to the
8  questions about Parker Meyer's February 2016
9  testimony about hit the roof, there was no
10 objection to that by you either, was there?
11   A    No. I mean, Parker's referring to Part 1
12 of her deposition, where I was trying to get
13 defense counsel to focus on the events of the night
14 in question.
15   Q    One of the things lawyers have to do in
16 civil cases is exchange interrogatories, which
17 contain a list of witnesses, right?
18   A    Yes.
19   Q    Was Carla Kjellberg ever on the witness
20 list for either --
21   A    I doubt it.
22   Q    -- of the cases?
23   A    I doubt it.
24   Q    Carla Kjellberg's not a witness to any
25 facts in either of Parker Meyer's cases, right?

```
 1      A    Correct, until she interjected herself.
 2      Q    Well, and she was not on either witness
 3 list, correct, for either --
 4      A    I think that's -- I think that's correct.
 5      Q    You obtained an audio recording of the
 6 Minnesota unemployment hearing.  Is that right?
 7      A    That is correct.
 8      Q    And that is how Parker Meyer had
 9 possession of it, because you gave it to her,
10 right?
11      A    That is correct.
12      Q    And do you know how the transcript of the
13 hearing was made?
14      A    I understand it was prepared by your
15 office.
16      Q    And there's no evidence or information
17 you have that the defense lawyers in Parker Meyer's
18 cases ever saw a transcript of the unemployment
19 hearing in Minnesota, correct?
20      A    No, nor was I worried about that.
21      Q    And there's no information or evidence
22 that the defense lawyers in the underlying two
23 cases, Parker Meyer's cases, ever had an audio
24 recording of the hearing either, correct?
25      A    I would think that's a fair statement.
```

```
 1      Q    What would Jeff Anderson's motivation be
 2  to damage Parker Meyer's cases?
 3      A    His motivation would be when he felt like
 4  he might not get a part of any fee, his priority
 5  was to try to gain leverage against me, and so his
 6  motivation is to swing at me, and he seems
 7  oblivious to the fact that he's also swinging at
 8  his own client.
 9      Q    He damaged the cases so he could get
10  leverage against you?  Is that your testimony?
11      A    No.  He's trying to damage me to get
12  leverage against me.  He's oblivious to the fact
13  that he is swinging and hitting his client as well
14  as me.
15      Q    We've talked a little bit in your
16  deposition about evidentiary issues, correct?
17      A    Correct.
18      Q    And exclusion of irrelevant evidence,
19  right?
20      A    Yes.
21      Q    Mr. Meyers, I'm having trouble seeing
22  what the relevance of your relationship to Parker
23  Meyer is in a warrantless entry Fourth Amendment
24  case.  What's the relevance of that?
25      A    I would say it's pretty irrelevant, Sam,
```